Yes, good morning, your honor. It's Tony Farmani on behalf of Mr. Cadavid. Your honor, before I go to the issues, as you, as your court, as the court is aware, there's several issues that have been certified for appeal. Before I get to that, your honor, I just wanted to put the case in perspective a little bit here. Mr. Cadavid has been in prison since October of 1999 for over 20 years, your honor. We know for a fact that the judge who adjudicated his guilt and punished him, gave him a life sentence, he was being investigated by the California Supreme Court for lying about his credentials when becoming a judge, and then later disbarred. And he was, he was at the time that was presiding over judge, over Cadavid's trial. He was preparing a defense to those charges. We also know, your honor, that the lawyer who represented Cadavid is now disbarred, was disbarred in 1998, 1999, and around 2000, when she takes the case from, takes over the case for Mr. Cadavid. May I ask why this is relevant to this appeal? Well, it's relevant because one of the issues here is whether or not he knowingly waived his right to a jury trial. One of the issues is whether or not he was denied his Sixth Amendment right to an effective assistance of counsel. And the other one being whether or not he knowingly and willingly waived his right to a jury trial. So the judge, who the judge is, I think plays a huge part in this, your honor, because habeas corpus relief is in fact for people who have been wronged by society, as a district judge put it. And this case is in fact one of those cases. But just moving along, just focusing on the issue itself, after years of litigation, some of which were devoted to just procedural issues, what it's come down to in this case is whether or not Mr. Cadavid has shown sufficient prejudice to be granted relief. And the district court judge, who, yes, your honor, on the, in effect, I'm going to focus on the ineffective assistance of counsel to begin with, unless the court has any questions regarding the other issues. I would get into it because you've already, you know. Absolutely, your honor. So the prejudice prong, we have, we had an expert at trial, Dr. Brook, and we have an expert at the federal court evidentiary hearing. Both of whom have said that Mr. Cadavid was not in the right state of mind when he walked into that house. When he went into that house, he was not in the right state of mind. His actions, the way that he conducted himself, according to the witnesses that were there, he was not in the right state of mind. Now, there is absolutely no way we can go back in time and measure his blood alcohol level at the time of the crime or whether or not he was taking meditations and whether or not he was on marijuana. But what we do know is, your honor, that less than an hour after the crime and half an hour after he gets arrested, he's taken to the emergency room, directly to the emergency room, your honor. And he's been treated there for over four and a half hours at the emergency room. And the lawyer, Ms. Brenda Vargas, she didn't even take the time to get those records and submit them to the expert, Dr. Brook, to review them and formulate an opinion on them. She subpoenaed them. She subpoenaed them, but she never followed up on them. I think she admitted it throughout the evidentiary hearing, your honor, that she never followed up on it. She never obtained them. She doesn't know if the expert had it on his own. But we know for a fact the expert didn't have it because the expert outlines what records he relied on, that being Dr. Brook, and one of those records was not the St. Francis records. I don't think there's any legitimate dispute here that anyone ever obtained those records within trial. If she had obtained those records, your honor, and had them at the time of trial, how would they have assisted her in the defenses that she raised, the seizure defense? Well, she only raised a seizure defense that was based on really Dr. Brook's testimony and evaluation. How would those records have helped her? Yes, your honor. Because the ineffective assistance of counsel is failing to obtain those records and to utilize them at the trial. Yes, your honor. Absolutely. So if you assume that there was ineffective assistance of counsel, then the question is, would it be a different result? With a reasonable probability that the outcome would have been different. Yes, your honor. The reasonable probability whether or not one juror would have had reasonable doubt about his guilt. So what would she have said that those records showed? Those records, well, I don't know if she would have said anything personally, but I think what lawyers do, what they should be doing, is get those records and submit it to the expert. The expert is the one who's able to, yeah, the expert would have seen those records and the expert has already indicated in his report, not knowing about those records. Now you're talking about the expert who testified at the federal proceedings? No, I'm talking about the expert who testified at trial. If she had obtained those records, your honor, to answer your question, if she would have obtained those records, she would have turned them over to the expert, Dr. Brook, and Dr. Brook would have utilized those records in formulating his opinions. Now what those records reveal is that Mr. Cotterveid had a blood alcohol level that was three times the legal limit. Was there a blood alcohol level test made at the time he was brought to St. Francis? Yes, sir, it was. Yes, your honor. It was part of the record. So he's got a high blood alcohol level. We know that when you have a seizure issue, brain damage, alcohol can exasperate that. We know that for a fact. We know that from the experts. Both Dr. Brook noted it in his report and we also know from the Dr. Zardoz who testified at the evidentiary hearing. So Judge Pai has asked the question and the answer to that would be, your honor, that the expert would have used that record to show that he was in fact had a blood alcohol level which would have enhanced the seizure defense or would have introduced another defense which would have been based on intoxication. Voluntary intoxication is in fact a defense to discharge, your honor, under California law. So that's how he would have utilized it. Well, now what about the testimony of Dr. Zardoz? Did I pronounce that correctly? You did, your honor. Who explained that Mr. Cuddeby's behavior was goal-oriented, volitional, threatening to kill, demanding money, searching through dresser drawers and so forth. I, Dr., respectfully, your honor, Dr. Zardoz didn't say that's what he was doing. They were asking him during cross-examination whether or not in general speaking, and he's very specific about that. He keeps saying, I can't talk to you guys in general. We're talking about this particular case. I was at that deposition, your honor, and I can tell you that he never used, those words did not come out of his mouth. There were such. Wasn't he put on, wasn't the doctor put on notice about what happened here, the choke hold, the threatening to kill and so forth? And based on that. Yes, your honor. Didn't he conclude that his behavior was volitional? No, your honor. He concluded that if you act that way, then you're not under seizure. That doesn't necessarily mean that other factors are not playing, are not being played here. And that's what he said. He said that in order for you to judge this person, you have to look at all the circumstances, including the fact that he had blood alcohol level and opioid in the system. And the fact that he has, no doubt about it, a brain damage. So when you combine all those together is what he said, that this person was not in the right state of mind. And the reason why he knows that, your honor, critically, the reason why he knows that is because he's got the St. Francis records. Because his look, he's relying on scientific evidence, evidence from other medical doctors and nurses. And he's formulating that opinion. Something that Dr. Brooke never had an opportunity to do because the lawyer failed to do her job. Unless the court has any questions on this particular issue or any other issue. The other issue, your honor, I think there, my contention with respect to the jury trial waiver, your honor, would be that in order for a lawyer to be able to advise someone to give up their right to a jury trial, they need to know all the facts. They need to have done their due diligence and obtained discovery, reviewed it, and discussed it with the petitioner. This person was facing a life sentence for convictions that he had committed when he was a juvenile one and one in New Jersey later on in his life. All of which stem from, majorly stem from his brain damage, your honor. And no one has taken the time to take care of this person's issues, but they have just simply put him in prison. And you can see this case, how that happened. And with respect to the other issue, your honor, that the court has certified his right to a public trial, that issue, your honor, I'm not going to push that issue too far because I do realize that there was. Just a moment. Yes, your honor. With respect to the waiver of the jury trial, was that issue presented to the state court? Yes, your honor. As far as I can tell, that issue was presented to the, the issue that is, if I remember correctly, the issue that is in dispute, whether or not, is what happens when Vargas, Brenda Vargas, finds out through mailings, through other, is given notice that the judge is under investigation, has lied about his credentials, one of which being a psychologist. Was this presented to the trial judge in the district court? Yes, your honor. Judge Selma? Yes. That those issues, the issue, the issue, I presented that issue. In effect, the claim was exhausted and the issue was raised before Judge Selma. It wasn't before Judge Selma. Judge Selma did away with this case a long time ago. Then he went to Judge O'Connell, who, as you know, I'm sorry, I meant the district court. Whoever the judge at the time of this event. Yes, your honor. It was not presented, that argument itself was not presented to the California courts. It was presented in the context of a habeas petition later on, within the context of an IAC claim. In effect, it was a system of counsel claim. We went back and exhausted it. I mean, this case has been going back and forth in state court, the ninth circuit, back in the district court. And now we're here and it's all coming down literally to that prejudice prong for the IAC claim. So I can understand your jury trial waiver argument a little bit better. Sure. Are you arguing that the waiver is not valid because the trial lawyer and the defendant did not know all of the facts about the specific state court judge? Or are you arguing the waiver is not valid because of his brain damage? The waiver is not valid, your honor, because not only did he know about the trial judge, about who he was, that he had lied about it, he waived because he was under the impression that the trial judge had a psychology degree, which was a lie, a fabrication that he made up in his mind. It was never true, the judge being. And then the second one being that Brenda Vargas, the lawyer, didn't have the facts. She had nothing. She went in there and talked to him for five minutes and says, me and the prosecutor have decided we should waive jury trial. The prosecutor didn't even have the case in preliminary hearing. He got the case the day before, the day after they waived jury trial. Another prosecutor took the jury trial waiver. And it was maybe a 30-second waiver, if that. That's my contention with respect to that, your honor. Unless the court has any questions, I would like to reserve the remainder of my time for rebuttal. Thank you. Good morning, your honors. Deputy Attorney General Julie Harris for respondent. May it please the court. I'd like to begin by just addressing a few things that opposing counsel said before I get to my prepared remarks. First of all, there are no contentions of judicial misconduct in this case. Second, although opposing counsel is talking about disciplinary proceedings against Brenda Vargas, she has not been disciplined in connection with a criminal case in over 20 years. Opposing counsel also said that it's impossible to measure the blood alcohol content at the time of the crime. That's incorrect. It's absolutely possible to get a blood alcohol content expert who would be able to perform calculations in order to determine what petitioner's blood alcohol level was at the time of the crime. But do you have to know how much they were drinking and when they were drinking? They have to know. Well, first of all, there were... Beer or whether it was hard alcohol to do those calculations. Your honor, they need to know what his height and weight was at the time of the crime. And they need to know what his tolerance level was at the time of the crime. And once they have those points of data... Did he volunteer that information? I don't believe that any of that data was collected on federal habeas in order to... How about at the time of the trial? The information that came forth about his alcohol intoxication at the time of trial was information that he provided both to the police and to different clinicians that evaluated his mental state. And I believe he told one of the clinicians that he had a few beers before the crime. He told the police that he had beers and I think it was Bacardi before the crime. So there are some differing assessments about what he actually drank, but that's the information that he provided. And do you agree that voluntary intoxication would have been a defense or could have been a defense? It could have been a defense, your honor, but petitioner was unable to show the data that was necessary in order to prove a defense like that. You can't just look at that 0.21 number that was taken after the crime occurred without having an expert explain what that number means. And especially in this case, where we know that petitioner has been abusing drugs and alcohol since the age of nine. So for him, his tolerance is going to be a lot higher than the average person. And just finally... Was it at the federal evidentiary hearing that we learned that he had a long time history of abuse of alcohol? No, that was at the trial court level. That was something he told his expert, Dr. Brooke. Just to move on to prejudice, your honor. Nothing that petitioner presented on habeas would have changed the outcome of his trial because the record clearly showed that petitioner had the specific intent to commit attempted robbery and burglary. In addition, petitioner's own expert who we've been discussing, Dr. Zarduz, on federal habeas, admitted that petitioner could not have been suffering from a seizure or its aftermath when he committed the crimes. And he also admitted that petitioner's actions were voluntary and goal-oriented. Dr. Zarduz's conclusion, and Dr. Zarduz was a neurologist, I believe. So Dr. Zarduz's conclusion concerning voluntary intoxication as a standalone defense was completely unsupported. This claim is entitled to ad pedeference based on the California Supreme Court's silent denial on habeas. And to the extent that this court wishes to consider the evidence elicited at the evidentiary hearing in this case, a hearing which occurred over respondent's objection, review would be de novo. However, under either standard of review, this claim fails because petitioner is unable to show prejudice. By the way, you don't challenge the fact that the district court had an evidentiary hearing? Oh, no, I was at the evidentiary hearing. It definitely happened. No, I know, but I mean, you said the district court conducted an evidentiary hearing over your objection. Yes. You don't pursue that. You didn't pursue that here. No, I'm just noting that it was over our objection at the time, yes. What was the basis for the evidentiary hearing? Was it that there was an unreasonable determination of the facts by the state court? No, it was D-1. It was an unreasonable application of Strickland in this case. And the magistrate... On the ineffectiveness? Correct, Your Honor. And the magistrate... And that provided the basis for an evidentiary hearing? According to the magistrate judge, yes. But the magistrate judge got that wrong. The magistrate judge assumed that the California Supreme Court on habeas, when they're looking at prima facie evidence, that they take all factual allegations as true. And so on that basis, the magistrate judge said that assuming all of the allegations that Petitioner made on habeas were true, that Petitioner was entitled to granting of the writ or at the very least a hearing. And on that basis, the court said that the California Supreme Court had misapplied Strickland. However, the California Supreme Court does not look at all factual allegations as true. They do not accept conclusory allegations, unsupported allegations or allegations that are controverted by the record. And in this case, that's exactly the record that the California Supreme Court had before it, because there was extremely strong evidence of specific intent in this case. And that was compared to some fairly weak evidence that there had of Dr. Sarduz's declaration, which was largely duplicative of testimony that Dr. Brooke gave a trial. And also there was evidence based on Petitioner's common law wife from trial who described how Petitioner behaved during a seizure. And that description of Petitioner did not correlate at all with how he behaved during the crime. Ms. Ortiz said that during a seizure, Petitioner was confused and dazed and mumbling. And that is obviously not at all the way he conducted himself during these crimes. In fact, Dr. Sarduz admitted that the actions that Petitioner took during the crimes were goal oriented and purposeful and were not consistent with a post-seizure state. And these actions included entering Ms. Telling her neighbor, Casillas, that she had the wrong apartment in order to get rid of her. Pushing the 90 year old victim, Ms. Vento, into her bedroom and onto her bed, rummaging around in her dresser. Demanding money from Vento. Placing the neighbor Casillas in a chokehold and threatening to kill Vento and Casillas if Vento did not give him money. Fighting Casillas' husband in order to get away. Scaling a wall at the apartment complex and jumping over two fences. Attempting to hitch a ride outside of the apartment complex and removing his shirt in an attempt to avoid police. All of these actions taken together show that Petitioner had the specific intent to commit attempted robbery and burglary, which. By the way, the specific intent we're talking about is not a very high bar here. Specific the intent to commit. Um, excuse me, to commit burglary would have just been the intent to commit a felony and for attempted robbery, it would have been attempt to commit a robbery, and that would have been satisfied alone just by the chokehold that he placed on Ms. Casillas, the demand for money and the threat to kill both of them. Now, how would the, uh, they had raised a intoxication defense, wouldn't that have negated? Couldn't that have negated some of the intent? It could have negated some of the intent had they provided the correct documentation and analysis of what that because, again, the St. Francis records only showed a point to one number. So theoretically, point to one, in some cases, might be sufficient to overcome specific intent. However, in this case, there are two problems that petitioner has. He has the problem with the fact that there is very strong evidence that he had specific intent in this case, despite elevated blood alcohol. And there's also the problems of proof, because even on federal habeas, there was not proof provided of his blood alcohol content at the time of the crime. There was Dr. Zarduz was not qualified as an expert in blood alcohol content. Nor did he perform any of the requisite testing and analyses that he would have needed to perform, which would have taken into account petitioner's size and weight and his tolerance level, and would have determined what type of effect that that had on his state of mind. And in fact, the case that petitioner primarily relies on, Miller versus Terhune, in that case, they actually had a blood alcohol content expert who discussed blood alcohol content at the time of the incident and discussed the defendant's tolerance, and made very specific findings about how that would play into his state of mind at the time of the offense. And that is exactly what's lacking in this case. In addition, as I mentioned before, Ortiz's testimony at trial did not support the fact that petitioner was having a seizure during the crime. And the St. Francis records themselves also do not support either a seizure defense, nor do they show what petitioner's blood alcohol content was at the time of the crime. Does it show, do those records show what time they took the blood alcohol? I think that, I think they do show that, but I think it was a few hours after the crime. After the crime? I believe so. I couldn't tell. You want to address the other claims? Yes. Counsel, I have a specific question. You heard my questions to opposing counsel about exhaustion and raising in the district court. What's your response? Yes. The jury waiver claim was not exhausted. It hasn't been raised in, so the first problem is- So where specifically do you disagree with counsel on that? Everywhere, I suppose, your honor. Okay. So the claim was not properly raised in the district court, so it's never been adjudicated by the district court below. That's a waiver then? The other, yes. The other problem that petitioner has is that the claim is unexhausted and- I guess we're, if we cut, if we leave things there, he says it was exhausted. You say it wasn't. Can you give us a little more to go on? Well, what is your, the basis for your saying that it was not exhausted? The claim has never been presented to the California Supreme Court. Okay, so the, it's the absence of a record- Yes. That controls here. Very well. Correct, your honor. And also I'd like to note that the fact that the claim was unexhausted and untimely is something that the district court noted in 2010 when it declined to claim. Would the court like me to get to the merits of the claim, despite the procedural hurdles in this case? Why don't you address the other claim, the right to a public trial? In terms of the denial of right to public trial claim, the district court found that this claim was waived, and that's a factor to be considered in this case. However, in any event, there's no closure in this case, because there was no evidence that the trial court ordered the courtroom closed, nor was there evidence that there was anyone prohibited from attending who wished to attend. The closure was also too trivial to implicate the Sixth Amendment, because the testimony of Ms. Vento was very brief. And while, obviously, she was an important witness, she was one of the main victims, she was not the only victim to testify. Barbara Casillas also testified. And in many ways, her testimony was much more damaging to petitioner, because Ms. Vento, by the time of trial, was 90 years old, was very confused and admitted her confusion at trial. Whereas Ms. Casillas is the one who testified about the chokehold and the demand for money and the threats to kill. And so that evidence was far more persuasive in this case. In addition, the accommodation of this frail and elderly witness was reasonable, because there's no evidence in this case that Vento was not ill or unable to attend trial. And she candidly admitted, as I mentioned, during her testimony, that her hearing and memory were impaired. And just to sum up, it was actually better for petitioner in this case that the testimony ended up being taken at her home. Because had she been declared unavailable, which is likely what would have happened had they not accommodated her, her preliminary hearing testimony would have been used. And that testimony, as the district court acknowledged, was more detrimental to petitioner than her trial testimony. Just to summarize the IAC claim, petitioner was obviously in control of his actions during the crime. He was able to make demands for money, threats to kill, place people in chokeholds, and he appropriately fled when confronted. On the other hand, the St. Francis records did not show that petitioner was having a seizure when the crime occurred, and that was a fact confirmed by Dr. Zarduz. Petitioner also failed to present evidence that his blood alcohol level prevented him from forming specific intent. Therefore, we would ask that the district court's judgment be affirmed. Okay, thank you. Thank you. Just a few things, Your Honor. Number one, Judge O'Connell affirmed Magistrate Judge Boothridge's finding that the California Supreme Court determination was unreasonable. The state challenged it. We had briefings on it, and Judge O'Connell, before she, the late Judge O'Connell, she issued an order saying, overruling the defendant, the respondent's objections and saying, quote, Judge Boothridge's determination that the California Supreme Court unreasonably replied federal law is supported by the record in this case. So that's that. And then, wait a minute, that's a very broad characterization. The issue is whether this specific claim was raised in the state court. You and your counsel are obviously at odds on that. What are you relying on? No, Your Honor, I was, I was, I actually, Your Honor, I was addressing the ineffective assistance of counsel claim, the evidentiary hearing that Judge Piah, Piah, Piah has indicated earlier and asked, how did that, how did that come about? That's the part that I was getting at. I wasn't answering that question, Your Honor. But- Well, I'd like you to answer it. At your convenience. Absolutely, I'll answer it this way, Your Honor. The, the arguments that were made that the Attorney General's office saying that we're unexhausted. Those arguments were presented to the California Supreme Court in a context of ineffective assistance of counsel claim. Whether or not Brenda Vargas was, was deficient, constitutionally deficient when advising Mr. Cordova to waive jury trial. So in that, in that respect, the same arguments that were presented in the federal court were presented to the California Supreme Court. But you didn't raise the freestanding. I did not, I, I wasn't, yes, Your Honor, he was acting pro se at the time. He did not raise that. He found out about it. He found out about it and he, you know, he brought it out that there was a ju, there was a judge that was being investigated and later removed for lying about his credentials, but. The claim he raised, he, he, the claim he raised in the IAC regarding his waiver of a jury trial was that his counsel did not advise him properly? Yes, Your Honor. He, and he was under false pretenses that the judge, he, he waived jury trial, Your Honor, because he was told that the judge had a psychology degree. And therefore is more, much more able to understand scientific evidence than jury. And that wasn't true, Your Honor. The premise underlying his waiver was completely false. What would a competent counsel at that time have done to uncover that? I'm not denying that she, I don't think she could have at that point. But what she, what I'm saying with respect to that aspect of it, Your Honor, is that the attorney didn't investigate the facts. And then we, the, for, for the attorney general's office to stand over here and say, seizure, seizure, seizure, he wasn't under seizure. No one is saying he was under seizure. I want to be clear about that, Your Honor. Dr. Zarduz is saying, based on what he has reviewed, he's the expert. He's the one who can make that determination. He's saying, based on what I've reviewed, excuse me, his conduct during the crime, hemmed and hawed, didn't want to come to anything, just moving around, standing still, not stealing anything, and, and that's what he was talking about. So you're over your time. Yes, Your Honor. Thank you very much. Thank you. Matter submitted.
judges: O'scannlain, Paez, Simon